IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 08-cv-02335-RBJ-CBS

CYNTHIA MOLTZ BRAY, individually, and as the personal representative of the Estate of
John Bray,

      Plaintiff,

v.

SUN LIFE AND HEALTH INSURANCE COMPANY (U.S.), fka Genworth Life and Health
Insurance Company, a Connecticut Insurance Company, and
MANAGEMENT SERVICES INDUSTRY GROUP INSURANCE FUND, an ERISA multiple
employer welfare arrangement plan,

      Defendants.

---

**ORDER**

---

      This case arises under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 et seq.  It is a review on the record of the defendant's denial of

long term disability and life insurance benefits under the terms of an insurance policy issued to

the employer of plaintiff's late husband, John Bray.  Plaintiff moves for summary judgment

[docket #79].  At the conclusion of briefing on the motion, the parties jointly moved for

judgment on the pleadings [#88], essentially signaling that the motion for summary judgment

was ripe for determination.  This order resolves those motions and this case.

### FACTS

      The Court finds the facts to be as set forth below.  These facts taken from documents in

the record.  The Court has considered the parties' disputes about some parts of one another's

statements of "undisputed material facts."  However, the record supports the following as an

accurate and sufficient statement of the material facts.  They are largely undisputed.

John Bray became employed by PhoCusWright, Inc. ("PCW") as Vice President of Advisory Services on January 1, 2005.  LTDAR 181.[1]  He had approximately 15 years of experience in the travel industry and held both a B.S. and an M.S. degree in Computer Science.  *Ibid*.  He was hired to run the "Advisory Services" division of the company.  LTDAR 52; 189-190; 326.  He was recognized as an industry leader with a good reputation among his peers.  LTDAR 168.

As will be discussed in more detail below, during 2005 the Advisory Services division did well, outperforming the two other divisions of the company.  His division did not do nearly as well in 2006 as it had in 2005.  Throughout 2006 colleagues, clients, and others observed that Mr. Bray's behavior was increasingly angry, agitated, sometimes confused, and generally uncharacteristic of him.

Finally, on September 29, 2006 Mr. Bray presented to his family physician, Arlis Adolf, M.D., complaining of anger, frequent mood swings, being wrongly interpreted, going from low and lethargic to enthusiastic, an inability to concentrate and focus, and depression and difficulty sleeping.  LTDAR 303.  Mrs. Bray presented Dr. Adolf with a letter she had written, at Mr. Bray's request, describing his behavior.  LTDAR 331.  She describes, and gives examples of, his short temper, sudden changes of emotion, rages, feelings of being attacked, saying improper things to her, the children and others such as waiters and service personnel, blaming and shaming others, creating public scenes, drinking, and secretiveness.  One passage in the letter states:

> John has been through approximately seven jobs in 14 years I've known him (to my best recollection).  He seems to go through a cycle of being very excited an [sic] in love with a new job and the people he works with, then falls into

---

[1] The record [#90] is comprised of Attachments A and B.  The documents in Attachment A have Bates numbers "AR 1" through AR 357.  The documents in Attachment B have Bates numbers "AR 1" through "AR 975."  The Court will use "LTDAR" when referring to Attachment A as these documents refer to the LTD claim, and "AR" when referring to Attachment B as these documents refer to the LI claim.  The important thing is that the Court recognizes, as do the parties, that only documents considered by Sun Life up to its denial of the LTD claim are part of the record for that denial.  Those documents later became part of the record for the LI claim.

discontentment, ends up not getting along with his co-workers and ultimately gets let go.  John also has few friends and has lost many in rages.

Dr. Adolf diagnosed complex psychological problems and prescribed Paxil.  LTDAR 304.

PCW terminated Mr. Bray, effective October 4, 2006, citing the poor performance of the Advisory Services division.  LTDAR 2-3.  The jobs of two other members of the division were also eliminated.  The following day PCW entered into a Professional Services Agreement with Mr. Bray under which he warranted that he would complete certain outstanding projects and scheduled speaking engagements "without any limitations."  LTDAR 258-260.  Thereafter, in addition to providing services to PCW under this contract, he opened his own consulting business.  He continued to travel to various destinations where he spoke at conferences, and he published articles in industry journals.  He also apparently applied for a position with Yahoo.

Mr. Bray also continued to see Dr. Adolf.  As late as April 27, 2007, she continued to attribute his symptoms to psychological issues.  LTDAR 276.  In her record of that visit Dr. Adolf indicated that his symptoms were worsening and included anxious mood, hypersomnia, decreased ability to concentrate and fatigue.  She noted that he felt "shaky, especially before speeches, which is new for him, and can't sit or lie still."  She described recent stressors as including "unemployment and Laid off from most recent job because of his anger and 'acrimony' issues."  She indicates that Mr. Bray reported that he was working as an independent consultant but was feeling "lethargic all the time" and was having "trouble focusing and feeling spacy."  Dr. Adolf changed his medications.

However, on May 21, 2007, after contacting Dr. Adolf again to complain about migraines, vomiting, nausea and blurred vision, disorientation and crashing his car into his garage, he underwent a CT scan of his brain.  LTDAR 300.  The CT scan revealed a large tumor,

specifically "a 5.3 x 4.5cm centrally necrotic mass involving the right thalamus and right periventricular region with associated mass effect." *Ibid*. An MRI from the same day showed a "large ring enhancing mass with epicenter in the right thalamic region most probably a high grade glioma." LTDAR 297. The tumor proved to be malignant. Mr. Bray was referred to a neuropsychologist, Jay Schneiders, Ph.D., and a neuro-oncologist, Edward Arenson, M.D., for further treatment. LTDAR 319.

On May 22, 2007, after meeting with Mr. Bray, Dr. Schneiders noted that "last year in the late summer the patient began to become increasingly irritable and experience uncharacteristic explosive verbal outbursts." He continued,

> [t]his is a patient with a many month history of personality and affective regulatory changes different from his normal baseline; developing gradually topographic disorientation, visual memory loss, and decreased visual spatial processing, with left sided symptoms of neglect (bumping into things, running into the garage with his car, etc.).

LTDAR 313-15.

On May 24, 2007 Mr. Bray underwent brain surgery consisting of stereotactic resection through a right parieto occipital craniotomy. LTDAR 310-12. Chemoradiation therapy to the tumor bed and residual disease was also undertaken. LTDAR 282.

On May 31, 2007 Dr. Arenson, the neuro-oncologist, completed an Attending Physician's Statement in which he stated that the symptoms first appeared and that the patient ceased work on May 21, 2007. LTDAR 356.

On June 4, 2007 Dr. Adolf, the family physician, saw Mr. Bray again. In her record of that date she states,

> I think many of his angry outbursts and mood swings of the last year are secondary to his tumor, but seem to be significantly worse in the last month or so. Obviously this tumor has been growing for an unknown amount of time, and is unresectable because of proximity to vital parts of the brain, including his

consciousness, probably impairing L vision, but also certainly causing non-recognition of his L side at times.  Prognosis is guarded at best and will need aggressive radiation and chemotherapy.

LTDAR 274.

In a letter dated June 7, 2007 Dr. Arenson stated,

[t]he history of the onset of this tumor took place over a course of many months. I understand that the patient lost his job because of unusual and erratic behavior. Based upon the histopathology of this tumor, it is clear that this lesion has been present for quite some time and has very gradually evolved to the current level of malignancy.  Therefore, it is highly probable, if not absolutely certain, that the patient's behavioral aberrations were attributable to this lesion.

LTDAR 354.

Other than offering to provide additional information as needed, Dr. Arenson concluded his letter by declaring that "[a]t the present time [Mr. Bray] is completely disabled and under my care and I wanted to emphasize the fact that the onset of this disease and histopathology verifies our opinion that his loss of employment is attributable to this disease."  *Ibid.*

**Long Term Disability Claim**

On July 14, 2007 Mrs. Bray, on behalf of her husband, filed for LTD benefits with defendant Sun Life and Health Insurance Company ("Sun Life").[2]  LTDAR 327.  To qualify for LTD benefits, he was required to show that he had a "total disability" while the insurance was in effect, i.e., while he was employed.  "Total disability" for this purpose meant that, because of sickness or injury, "you are unable to perform all the material and substantial duties of your regular occupation" during an elimination period and for the following 24 months."  LTDAR 219.

The application described the illness as "acrimonious behavior, memory & vision loss, inability to complete tasks, headaches, anxiety."  It indicated that he was first treated for the

_____

[2] The insurer was known as Genworth Financial at that time but later changed its name to Sun Life and Health Insurance.  I will refer to the company as "Sun Life" for simplicity.

illness on September 29, 2006, and that he had been unable to work because of the disability since January 1, 2007. She explained that the dates concerning the history of the disability were difficult to determine because Mr. Bray was misdiagnosed for a long time. LTDAR 327, 329.[3]

In support of the claim Mrs. Bray, on Mr. Bray's behalf, submitted medical information including Dr. Arenson's letter of June 7, 2007, tracing the symptoms of the tumor back to behavioral aberrations predating the loss of Mr. Bray's job. Also submitted was an Attending Physician's Statement of Dr. Adolf who indicated that the symptoms first appeared on September 29, 2006, and that "his neurosurg, medical oncologist, neuropsychologist all think his behavior changes/exacerbations were due to his growing tumor which was not diagnosed initially." LTDAR 321.

On September 13, 2007 Sun Life denied Mr. Bray's claim for LTD benefits. LTDAR 251-52. The letter, written by Carol A. Earle, Senior Claim Administrator, noted that in order to qualify for benefits, Mr. Bray had to have had a "total disability," meaning that "you are unable to perform all the material and substantial duties of your regular occupation," before his employment at PCW ended. The letter does not comment on the medical information that had been submitted other than to acknowledge that Mr. Bray had seen Dr. Adolf on September 29, 2006 for mood swings; that on October 21, 2006 he reported doing better on Paxil; and that a thalamic mass had been diagnosed in May 2007. Ms. Earle stated that Mr. Bray was terminated by PCW on October 4, 2006 because of the closure of his division; that he signed a consulting contract with PCW the following day; and that she understood that he also sought other work. The letter concluded, "[a]s you were able to perform consulting work after the termination of

---

[3] Mrs. Bray later explained that she put down January 1, 2007 because PCW's Vice President told her to do so because PCW had paid for disability coverage through January 5, 2007.

your insurance and were seeking other employment, it is our determination that you were not disabled at the time your insurance terminated." *Id.* at 251.

Mr. Bray, through counsel, filed an internal appeal of the denial of LTD benefits on January 28, 2008.  LTDAR 149.  In support of the appeal, additional information was provided, including the following:

- A letter from Dr. Arenson dated October 24, 2007 in which he wrote, "[i]f I have to testify I will state categorically that this tumor was present at the time that the patient lost his job and that he was disabled by it."  LTDAR 166.

- A letter from Dr. Schneiders dated December 23, 2007 in which he wrote,

   [l]esions of the right thalamus have been reported in the clinical literature to result in behavioral problems quite consistent with those you and your wife describe emerging the months prior to your tumor being discovered, though it is true that they can also result from other conditions and for other reasons in certain people's cases. However, you and your wife were very clear with me that your symptoms emerged gradually and progressively during the months just prior to your tumor being discovered, and were extremely out of character with your previous and usual behavior. Based on the history you gave me, the MRI findings, and the clinical literature I mention, I told you it was my belief that your behavioral and cognitive symptoms sounded quite consistent with a right thalamic tumor. (A disinhibition syndrome, mania, impairment of intellect in various respects, memory disorders, and confusion all can occur with right thalamic damage.).

LTDAR 176.

- Another letter from Dr. Arenson, dated January 4 2008, in which he wrote,

   I have reviewed the job description specific to Mr. Bray, available on the website of his company, and based upon that, as well as my knowledge of the histopathology and location of his tumor and the expected correlation between the location of the tumor and functionality, that it is, in my opinion, to a reasonable degree of medical probability that Mr. Bray was disabled by this disease no later than the summer of 2006 and would have been incapable of adequately performing the very complex and demanding functions of his position as described.

LTDAR 175.

- An email from Julie Jacobs, PCW's Director of Sales, indicated that Mr. Bray's behavior during 2006 was sometimes adversarial and intimidating; that a client, Airtrade, had gone to PCW's President and Chief Executive Officer, Philip Wolf, and indicated that it would continue a project with PCW only if Mr. Bray were removed from the project team; and that by about August 2006 Mr. Wolf was "really frustrated with him."  LTDAR 184.

- Two emails from Simon de M Walker, a colleague who had worked with Mr. Bray off and on since 2002, contrasting Mr. Bray's work before 2006 to behaviors he observed that year, and relaying that another colleague had noticed odd behaviors when Mr. Bray was making presentations.  LTD 185-87.

- A letter from Ranan Grobman, VP Business Development for Certagon Corporation, indicating that his company had started working with Mr. Bray in the September/October 2006 time frame; had observed Mr. Bray to be forgetful and confused; had considered giving him a full time position but backed off because of concerns about his behavior; and had continued with him as an advisor primarily because of his contacts in the industry.  Mr. Grobman also commented that he met with Mr. Bray at a conference in April 2007 and observed that he was very tired (dozing off during sessions of the conference), unable to focus during conversations, holding his head near his eye during conversations, forgetful of meeting times or agenda, and distracted.  He asked Mr. Bray many times whether something was bothering him because of his lack of focus.  LTDAR 188.

- A letter from Mr. Wolf (the CEO of PCW) dated January 12, 2008, who indicated that Mr. Bray was often nasty and impatient with co-workers, and that his conduct with clients was occasionally unsuitable to the workplace. He indicated that many clients held Mr. Bray's work in high regard, but others complained that he was rude and gave inappropriate responses to questions. Mr. Wolf concluded

  John Bray's employment with PhoCusWright was terminated because the performance of the Advisory Services group he headed was significantly under budget and not doing as well in 2006 as it had in 2005 (as Ms. Lent has previously indicated). The issues outlined in this letter were not the direct cause of PhoCusWright terminating him; however, John's inexplicable behavior and actions in these respects were, in fact, inconsistent with the standards required to successfully perform his job.

LTDAR 189-90.

- Various other letters from people who worked with Mr. Bray before and during 2006, each giving their own examples of their experiences with Mr. Bray before 2006, during 2006, or both. LTDAR 191 (Vlasic); 193 (Shogren); 193a (Easton); 195 (Bergen); 196 (Graham). Letters from family members and friends were also submitted. LDDAR 197-205. The gist of these letters was that Mr. Bray was a different person in 2006, both at work and socially, than he had been previously.

- A letter from Mrs. Bray dated January 22, 2008 in which she detailed the deterioration of her husband's behavior during 2006. She indicated that he had great difficulty with his consulting work and job interviews after he lost his job at PCW. She stated that her letter to Dr. Adolf of September 29, 2006 (of which it does not appear that Sun Life was previously aware) had been written in frustration and anger and was neither accurate nor complete.

LTDAR 168-74.

On March 13, 2008, by means of a letter written by Paul L. Briere, LTD Appeals Consultant, Sun Life upheld the previous denial of Mr. Bray's LTD claim.  LTDAR 50-55.  Sun Life maintained its position that Mr. Bray was not "totally disabled" as defined in the insurance policy as of October 4, 2006 when he was terminated by PCW.  The letter acknowledged that the specialized duties and knowledge reflected in Mr. Bray's job description must be considered in evaluating his claim of disability.  However, Mr. Briere provided the following reasons for denying the appeal: (1) Mr. Wolf's letter of January 12, 2008 indicated that Mr. Bray had been terminated because of the performance of the Advisory Services group that he headed; (2) Christine Lent, the Vice President of PCW, had also indicated that the Advisory Services group was under budget, and that there was no other position within the company to which to move Mr. Bray; (3) following his termination, Mr. Bray signed the Professional Services Agreement with PCW in order to complete three specific projects; (4) information available on the Internet indicated that Mr. Bray had been a featured speaker at events on November 15, 2006 and January 24, March 18 and April 11 and April 24, 2007; (5) he had published articles in industry journals dated in the October 25, 2006 through April 26, 2007 time frame (he acknowledged that the articles might represent work done while Mr. Bray was employed but that some of them might not); and (6) after leaving PCW Mr. Bray had formed his own business, John Bray Consulting, was in demand as an international speaker, and had been able to engage in "extensive travel."

Mr. Briere's letter acknowledged that the appeal documents included "a letter from Dr. Edward Arenson of the Colorado Neurological Institute concerning the likely timeline for the development of Mr. Bray's brain tumor and his opinion concerning Mr. Bray's job performance as related to his illness."  *Ibid.* at 52.  Perhaps this was meant to refer to the two Arenson letters in the package.  Mr. Briere did not otherwise comment on Dr. Arenson's opinions, nor did he

mention the letter and opinions of Dr. Schneiders.  Sun Life did not obtain an independent

medical examination or any other medical consultation or advice of its own.

On October 28, 2008 Mr. Bray through counsel filed the original complaint in the present

case, asserting that Sun Life had wrongfully denied his long term disability claim in violation of

ERISA.

### Life Insurance Claim

Mr. Bray died on December 16, 2008 as a result of the brain tumor.  AR 930.  On January

15, 2009 plaintiff submitted a claim for life insurance benefits.  *Ibid*.  The present case was later

stayed for a period of time while the life insurance claim was being determined.

As with the long term disability claim, to qualify for survivor benefits under the life

insurance part of the PCW policy, Mr. Bray must have been totally disabled while he was still

employed.  However, for purposes of the life insurance benefits a person is considered totally

disabled "if an injury or sickness prevents you from performing all of the main duties of any

occupation that you are or become qualified for by education, training or experience."  AR 5-6.

On April 9, 2009 Sun life denied plaintiff's LI claim.  AR 560-67.  The letter, by Marie

Leveille, Life Benefits Specialist, notes that she had reviewed the LTD record (but not the

benefit determination).  In addition, "we" contacted Ms. Lent of PCW who confirmed that Mr.

Bray's position and two other positions were eliminated because his division was not profitable.

She noted that Dr. Arenson's Attending Physician's Statement of May 31, 2007 had stated that

Mr. Bray was obliged to cease work on May 21, 2007; that Dr. Adolf's Attending Physician's

Statement had indicated that Mr. Bray was obliged to cease work on December 1, 2006; and that

Mr. Bray's application for long term disability benefits stated that he had been unable to work

since January 1, 2007.  Ms. Leveille also repeated the facts that Mr. Bray had become an

independent contractor to PCW following his termination, that he had spoken at several conferences, and that he had opened a consulting business.  She made no reference to the opinions expressed by Dr. Arenson, Dr. Adolf or Dr. Schneiders other than her mention of Dr. Arenson's and Dr. Adolf's "Attending Physician Statements."

This denial was also appealed internally.  On June 3, 2009 Mrs. Bray sent a lengthy letter to Sun Life in which she responded to points made in the denial of the life insurance claim.  Her letter is in the record in two parts: pages 1-10 are at AR 658-67; pages 11-18 are at AR 525-32.  A formal appeal prepared by counsel followed on July 30, 2009.  AR 415.  Collectively the appeal provided the following information in addition to that which had been previously submitted:

- Another letter from Dr. Arenson, dated April 7, 2009, and addressed to Mr. Briere who had denied the LTD appeal.  AR 553-55.  Dr. Arenson stated that he found that decision to be "shocking and completely inconsistent with what I understand medically about this case, the location of the tumor, and the actual behavior of the patient leading up to his diagnosis and preceding his termination."  He stated that the tumor had been present for months, perhaps more than a year, and suggested that an incident of inappropriate behavior by Mr. Bray on December 29, 2005 appeared to be an early indication of the tumor's effects.  He described the affected part of the brain and the impacts such a tumor would have on interpersonal relations, executive function and memory, noting that even when an individual with this condition appeared to function normally, information is not retained in a way that the individual can act on it appropriately.  He stated that, based on the CT scan at the time of Mr. Bray's diagnosis, and his experience of a

decade and a half as a neuro-oncologist, he found it to be "inconceivable" that Mr.

Bray could have continued to provide service of any value in his occupation at the

time he was diagnosed, and that he felt "certain" that his termination in October

2006 was attributable to those deficits.  Dr. Arenson analogized Mr. Bray's ability

to continue to travel, make speeches and write papers to one's ability to say the

Pledge of Allegiance or say a prayer that one has said throughout his life.  He

found no evidence that Mr. Bray had been able successfully to create new

information or to respond appropriately to new situations.  He stated,

> I have no doubt in my mind, and would testify in court, that Mr. Bray was already
> extremely sick from his tumor dating back to the latter part of 2005 and
> throughout the entire year of 2006 and would have been unable to satisfactorily
> perform his functions at his job.  Unfortunately, for Mr. Bray and his widow, he
> was extremely determined to continue to work and to not let his family down and
> to not give in to the loss of self esteem that had occurred at the time of his
> termination.

- Yet another letter from Dr. Arenson, dated May 13, 2009.  He explained that the

   date in his Attending Physician's Statement that had indicated that the probable

   date of disability was May 21, 2007 was the date of the actual diagnosis, but that

   based on information he subsequently learned, he had written an extensive

   opinion "Mr. Bray was clearly disabled both intellectually and emotionally after

   December of 2005."  AR559.  Dr. Arenson added that "his tumor . . . produced

   undeniable symptoms more than a year before diagnosis."  *Ibid*.  He said that

   "there is no doubt in my mind" that changes in behavior and intellectual function

   noted after December 2005 were attributable to the tumor, and he reiterated that

   "anything that [Mr. Bray] did after December of 2005 was based on over-learned

   skills and an intellect high enough to allow him, temporarily though

unsuccessfully, to attempt his work, and with obvious decline in both quality and

ability." *Ibid*.

- A letter dated July 16, 2009 from Hal Stephen Wortzel, M.D., a neuropsychiatrist.

  Upon reviewing the May 21, 2007 MRI image of Mr. Bray's tumor, Dr. Wortzel,

  the neuropsychiatric and neurobehavioral expert, stated

  the image is both dramatic and tragic, revealing the tremendous size of his
  tumor.  Obviously, a lesion of this size does not emerge overnight; this
  lesion, and associated neuropsychiatric impairment, was present long
  before it was detected.

AR628.

He further stated that it was "obvious that Mr. Bray suffered from a devastating

illness with profound neuropsychiatric implications."  AR629.  After conducting

his review and providing an extensive medical discussion regarding the tumor and

its location in Mr. Bray's brain, Dr. Wortzel concluded,

[h]indsight is often 20/20, and it is now perfectly clear that Mr. Bray's
changes in intellect and behavior were the result of his tumor.  It is equally
clear that these changes occurred long in advance of his diagnosis, and had
achieved a disabling level by the time he was terminated.

AR630.

Regarding Mr. Bray's ability to work, Dr. Wortzel concluded that the

"constellation of cognitive, emotional, and behavioral problems he was exhibiting

equates with total disability." *Ibid*.  He further opined, "Mr. Bray was obviously

disabled in terms of his usual occupation, and his cognitive and behavioral

impairments would have precluded the ability to acquire the skills of a new job

and to routinely conduct himself in accordance with job requirements." *Ibid*.

In response to the question of whether "Mr. Bray was disabled in October of 2006 as a result of his neuropsychiatric illness" the doctor opined:

> The terms of Mr. Bray's insurance combined with his numerous professional responsibilities make it entirely clear that he was disabled by October of 2006.  His professional role obviously required specialized knowledge, high intellect, and effective interpersonal relations, all of which were substantially impaired by his tumor.  Additionally, the gross cognitive and behavioral impairments he was demonstrating would have severely interfered with attempts to adapt to new employment, including acquiring necessary new skills and/or knowledge and adjusting to new behavioral routines.  The seriousness of Mr. Bray's illness is obvious; it clearly had a devastating and lethal impact.  That the same brain tumor that killed Mr. Bray made him totally disabled well in advance of his death is both an intuitive and obvious reality.

AR631.

- An email from Mark Risley of Google to several PCW officers and employees dated May 2, 2007.  Mr. Risley expressed Google's extreme disappointment with the study recently completed under Mr. Bray's supervision.  The email criticizes the timeliness and the quality of the study, even to the point of threatening litigation if further charges were pursued.  This was one of the three projects PCW contracted with Mr. Bray to complete after his employment was terminated. AR 556-57.

- A letter from Chris Mitchell of Spectrum Equity Investors dated May 29, 2009 describing a project that his company commissioned Mr. Bray to lead in August and September 2006.  Mr. Mitchell stated, "[t]o label our experience with John 'frustrating' is an understatement."  It explained that Mr. Bray's analysis was "wholly inadequate," and that when Spectrum raised its concerns with Mr. Bray, his response was "downright bizarre," adding that "he was antagonistic, inappropriately confrontational, and on several occasions said things that were

patently untrue." He concluded "that John was either incapable of basic client comprehension, and/or that he was willfully choosing to disregard our requests." Spectrum disputed PCW's bill and avoided litigation by settling for an amount materially less than the contract price. AR 542.

- A letter dated May 22, 2009 from Susan Steinbrink who met Mr. Bray in 2003 and worked with him at PCW in 2005 and 2006. AR544-45. She stated that during the first nine months of 2005 he "managed projects with a calm, organization and diligence that ensured our team's success." At a PCW conference in 2005 he was "eloquent in his presentations and a major contributor in his role as moderator during the general session of more than 600 attendees." She began to notice a change in Mr. Bray's behavior in early 2006. Over the course of the year he became "increasingly abrupt, disorganized, forgetful, argumentative, tired and unpredictable." One example was a presentation in April 2006 when "he was so tired and unable to concentrate that he asked [her] to take over and lead a meeting." In June 2006 he "vehemently argued with a client during a strategy session merely for having a difference of opinion." On another client trip he "forgot about our plans to have dinner with colleagues even after my confirming earlier in the day." On another project later in 2006 he seemed apathetic and had trouble keeping track of each team member's responsibilities. She considered the changed Mr. Bray to be a "different man," and upon checking with another PCW employee discovered she was not alone in her impression.

- Another letter from Mr. Bray's colleague, Mr. Walker, dated May 24, 2009. AR 552. Contrasting his work with Mr. Bray in 2005, when he had been "energetic,

focused and organized," he described Mr. Bray's work on a project for National

Trust in 2006 as clearly substandard.  His sense was that the "work was never

really completed to the satisfaction of the client."  He added,

> [m]y sense was that he was not able to independently complete his work
> projects at PhoCusWright or conduct himself appropriately in his
> executive role.  The fact that he was presenting at shows isn't proof of
> much.  He had developed most of the content in late 2004 and early 2005
> with only minor updates thereafter.  He was simply redelivering material
> he had committed to long-term memory."  The letter discounts Mr. Bray's
> ability to present at shows as support for the proposition that he was not
> totally disabled because he "had developed most of the content in late
> 2004 and early 2005 with only minor updates thereafter.  He was simply
> redelivering material he had committed to long-term memory.

- A letter from Richard Pulliam, Director of Mashery, Inc. dated May 26, 2009.

  AR 537-39.  He both worked and socialized with Mr. Bray between 2001 and

  2003 and again from early 2005 and Mr. Bray's death.  In addition to the familiar

  description of changes in behavior beginning in 2006, Mr. Pulliam described

  incidents after Mr. Bray left PCW.  While attending a PCW conference in

  November 2006, Mr. Bray spoke to him about a consulting project in Italy and

  "seemed confused about a business idea that he himself had pitched to them" and

  "made very strange comments."  Mr. Bray ultimately gave the work to Mr.

  Pulliam.  When the two of them visited the client in Italy in February or March

  2007 to transition the work to Mr. Pulliam, "John's behavior was extremely

  erratic."  Mr. Pulliam called his wife and told her that "something was severely

  wrong with John and that I didn't know how to get him to listen to me and get

  him home."  He added that

> John sent me a couple of drafts of his keynote speaking presentations in
> 2006 and 2007 and asked me to look them over.  John had never done
> such a thing before, but he said he was having a hard time putting them

together himself.  The drafts he sent me were a complete disaster.  They were amazingly incoherent, with mistakes and errors throughout them, repeated slides and frankly looked like they had not been edited.

Mr. Pulliam concluded that "[t]here is no question John was greatly impaired from 2006 onward."  *Ibid.*

- Additional similar letters regarding Mr. Bray's behavioral and professional baseline and/or changes were submitted by Jan Tissera, President of TravelCLICK (AR385), Tim Davis, Senior VP of Hilton Hotels (AR547-548), Jason McNamara, a former colleague at FirstSolutions, John Hoholik, a PCW board member (AR546), and Christopher Schutte, a former colleague at PCW (AR541).

- Mrs. Bray 's explanation as to why Mr. Bray's application for long term disability benefits showed January 1, 2007 as the date of disability.  Mrs. Bray filled out the application.  She was told by Christine Lent of PCW that Mr. Bray's LTD insurance was paid through January 5, 2007; that it provided coverage through January 5, 2007; and that Mrs. Bray should write January 1, 2007 on the application "to be safe."  AR530.

On July 29, 2010 Sun Life issued a letter upholding its denial of Mrs. Bray's claim for LI benefits in a letter authored by Kristen Goodwin, Life Claims Analyst.  AR1-10.  She concluded that Mr. Bray was not prevented from performing "all of the main duties of any occupation" or even "all the customary and regular duties of his own occupation doing so both under the terms of his Professional Services Agreement, with PhoCusWright and as President of John Bray consulting."  AR 6.

Ms. Goodwin did acknowledge receiving reports and letters from Drs. Arenson, Schneiders and Adolf.  However, she indicated that these doctors were not treating Mr. Bray at the time of his termination, and that they were not aware of Mr. Bray's work after his termination.  AR 9.

The balance of the letter for the most part repeated information that Sun Life had cited in denying the long term disability claim.  Ms. Goodwin noted that Mr. Bray's application for disability benefits had indicated that he became disabled on January 1, 2007.  She did not mention Mrs. Bray's explanation as to why she, when filling out the application, had inserted that date (at the suggestion of Ms. Lent).  She noted that Mr. Bray's application for Social Security benefits listed the date on which he could no longer work as May 21, 2007.  That was the date his tumor was diagnosed.  She repeated that PCW had terminated Mr. Bray because his division was doing poorly and cited a statement by Ms. Lent that PCW was satisfied with Mr. Bray's job performance but could not find another place to put him in the small company.  The Lent letter also noted, but Ms. Goodwin did not, Mr. Wolf's earlier letter that had indicated that Mr. Bray's behavioral issues in 2006 were not the "direct" cause of his termination but were "inconsistent with the standards required to successfully perform his job."  AR 94.  Ms. Goodwin noted that after his termination by PCW he entered into a contract with PCW, formed his own consulting business, attended conferences, made presentations, and took business trips.  She also mentioned that Mr. Bray had applied for a job at Yahoo.

Ms. Goodwin did not comment on the information that had been presented concerning the difficulties and problems that had occurred after Mr. Bray's termination when he was attempting to complete projects, take on new consulting business, and make presentations.

Subsequent to the denial of the life insurance appeal, the stay of this case was lifted, a Third Amended Complaint was filed and answered, and the summary judgment motion was filed and briefed.

## STANDARD OF REVIEW

District court review of a denial or termination of benefits under ERISA is de novo unless the benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). If discretionary authority exists, review is under an abuse of discretion (arbitrary and capricious) standard. *Id.*

Sun Life argues that the discretion granted to the original administrator of PCW's plan, Phoenix American Life Insurance Company, was passed along to Genworth Life and Health Insurance Company which became Sun Life. Plaintiff argues that there was not explicit grant of discretion to Sun Life, and in any event, that Sun Life as both the administrator and payor is in a conflict position.

The Court will assume that Sun Life succeeded to its predecessor's grant of discretionary authority. *See Ray v. Sun Life & Health Ins. Co.,* 752 F. Supp. 2d 1229, 1232 (N.D. Ala. 2010)(so holding based on evidence produced by Sun Life in that case). Being in a conflict position is a factor to be considered in deciding whether there has been an abuse of discretion, but it does not change the scope of review. *Firestone,* 489 U.S. at 115. Accordingly, the Court applies an abuse of discretion standard.

**CONCLUSIONS**

**A.   Mr. Bray's LTD Benefits Claim.**

Under ERISA, an administrator, as fiduciary, "must discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries. . . . ."  29 U.S.C. § 1104(a)(1); *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008).  The Court concludes from the record of this case that this was not done.

When deciding "an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment," the Administrator "shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."  29 C.F.R. § 2560.503-1(h)(3)(iii).  This did not occur.

Nor did Sun Life, insofar as its denial letters indicate, give any serious weight to the strong medical evidence that was presented on Mr. Bray's behalf.  Treating physicians might tend to support their patients' disability claims.  However, that is no excuse for ignoring them, and if Sun Life had been suspicious of the bona fides of the opinions of Dr. Arenson and other treating doctors, it could and should have obtained its own medical information.  Even had the administrator acknowledged all of the medical evidence, it could not then reject it without a sufficient evidentiary basis for doing so.  *See Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1123 (9th Cir. 1998).  Sun Life did not have a sufficient evidentiary basis to reject the medical opinions.

As indicated above, to be considered totally disabled under the policy a person must be "unable to perform all the material and substantial duties of [their] regular occupation" at the time his employment ended and during an "elimination period" and the following 24 months.

LTDAR 219.  The medical evidence presented to Sun Life overwhelmingly indicated that Mr. Bray was suffering from an undetected tumor in his brain on October 4, 2006 when his employment was terminated, and that a tumor of that nature inevitably impacted his ability to perform his job satisfactorily.  When initially presented with evidence of aberrant behavior patterns at home and at work, Mr. Bray's family doctor diagnosed, incorrectly as it turned out, depression and prescribed an anti-depressant.  The behavior issues continued and worsened.  Yet even on April 27, 2007 Dr. Adolf continued to believe that Mr. Bray was suffering from mental health problems.  However, upon discovering the presence of a massive brain tumor on May 21, 2007, the medical opinions took a 180 degree turn.

On May 22, 2007 Dr. Schneiders, the neuropsychologist to whom Mr. Bray had been referred for counseling following disclosure of the tumor, implied that Mr. Bray's behaviors during the late summer of 2006 might have been related to the tumor.  Dr. Adolf quickly changed her diagnosis, indicating on June 4, 2007 that she thought many of Mr. Bray's angry outbursts and mood swings in 2006 were secondary to the tumor and noting in addition that these behaviors had become significantly worse in the last month or so.  A stronger opinion was expressed by Dr. Arenson, the neuro-oncologist, on June 7, 2007: "it is highly probable, if not absolutely certain, that the patient's behavioral aberrations were attributable to this lesion."

Sun Life denied the LTD claim without commenting on Dr. Arenson's, Dr. Schneiders' or Dr. Adolf's reports concerning the impact of the tumor on his previous behavior.  It only noted that Dr. Adolf had seen him in September and October 2006 for "mood swings."  It is apparent to this Court that Sun Life became fixated from this early date on the "facts" that Mr. Bray's termination was due to the poor performance of his division and that he continued to do work thereafter; and that Sun Life stubbornly and continuously thereafter refused to credit what

the doctors were saying.  The issue was not why Mr. Bray's employment was terminated.  It was whether he was able to perform all the material and regular duties of his occupation.  It does not appear that Sun Life considered, then or later, whether the poor performance of the division might have been related to Mr. Bray's behavioral issues, or whether the work he attempted to do after his termination was performed competently and satisfactorily.

After the initial denial of the LTD claim, Mr. Bray's attorney provided more and stronger medical evidence in support of its internal appeal of that decision.  On October 24, 2007 Dr. Arenson advised Sun Life in a letter that "[i]f I have to testify I will state categorically that this tumor was present at the time that the patient lost his job and that he was disabled by it."  On December 23, 2007 Dr. Schneiders wrote that Mr. Bray's "behavioral and cognitive symptoms sounded quite consistent with a right thalamic tumor."  After reviewing the job description of the position Mr. Bray had held with PCW, Dr. Arenson on January 4, 2008 told Sun Life that "based on that, as well as my knowledge of the histopathology and location of his tumor and functionality, that it is, in my opinion, to a reasonable degree of medical probability that Mr. Bray was disabled by this disease no later than the summer of 2006 and would have been incapable of adequately performing the very complex and demanding functions of his position as described."

In addition, Mr. Bray's representatives beefed up the non-medical evidence.  A senior manager at PCW characterized Mr. Bray's behavior during 2006 as adversarial and intimidating, adding that a PCW client had refused to continue with a project if Mr. Bray remained on the project team.  PCW's President and Chief Executive Officer, Phillip Wolf, informed Sun Life that Mr. Bray was nasty and impatient with co-workers, and that reactions from clients were mixed.  While stating that those issues were not the "direct" cause of PCW's terminating Mr.

Bray, Mr. Wolf stated that "John's inexplicable behavior and actions in these respects were, in fact, inconsistent with the standards required to successfully perform his job."  As indicated above, numerous other letters from former colleagues, friends and family members were also submitted, providing more information about unsatisfactory work and behavioral problems before and after the termination of his employment.

Sun Life denied the appeal.  It all but ignored the additional medical evidence.  Mr. Briere's letter cited Mr. Wolf's letter indicating that Mr. Bray was terminated because of the performance of his division but did not comment on the parts of the letter in which Mr. Wolf indicated that Mr. Bray's behaviors were inconsistent with the requirements of his job and that his behaviors were not the "direct" cause of his termination.  Mr. Briere noted that following Mr. Bray's termination, PCW had contracted with him to complete three projects, but did not comment on his failure to complete at least one of them (Google) successfully.  He noted that Mr. Bray had been booked as a speaker at conferences, and that he had published articles, apparently ignoring evidence that Mr. Bray's work on at least some post-termination projects was unsatisfactory.  Nor did Mr. Briere seem to have considered the comment of a former colleague that Mr. Bray was having difficulty preparing to give speeches and was essentially just repeating material from much earlier speeches.  Mr. Briere did not know whether articles that were published post-termination were written earlier.  He either did not care about the quality of Mr. Bray's work or just assumed it was satisfactory.  But, as Dr. Arenson had told Sun Life, a tumor of that size and location would have made it all but impossible for Mr. Bray to have worked at a satisfactory level.

A claimant's attempt to continue working past the claimed date of disability does not necessarily preclude a finding that the claimant was totally disabled before ceasing to work

entirely.  *See Locher v. Unum Life Ins. Co. of America*, 389 F.3d 288, 297 (2d Cir. 2004);

*Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir.

2003).  A bright line test of that sort would unfairly penalize the individual who tries to work,

notwithstanding a disabling condition, and would essentially mean that he is "damned if he does

(try to continue to work)" and "damned if he doesn't."

Nor are the cases on which Sun Life now relies to support its decision persuasive.  In

*Kunstenaar v. Connecticut General Life Ins. Co.*, 902 F.2d 181 (2d Cir. 1990) a sales executive

expressed anxiety over a possible reduction in force to a company doctor who initially suggested

that he try to relax with a glass of wine at dinner and long walks and later suggested that he

consult a psychiatrist, which he did not.  He lost no time from work, and there is no indication

that his work suffered in any way.  The executive was thereafter laid off, and approximately two

months later he saw a psychiatrist who apparently diagnosed depression.  The court upheld the

district court's decision that the plan administrator had not abused its discretion in denying the

claim under a policy that required a disabled employee to be under the care of a physician while

employed and to have a sickness or injury that "completely prevented [him] from performing the

duties of his occupation or employment."  Not only is the policy language different from that at

issue in the present case, but the executive had presented no evidence that he was unable to

perform his job duties before he was laid off.  *Id.* at 184.

In *Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198 (8th Cir. 1998), the

court reversed the district court's reversal of the administrator's denial of benefits.  The

employee returned to his job as a salesman after missing time due to an automobile accident and

continued to work until he was fired for cheating the company.  His own doctor "believed him

capable of working at his regular occupation," and three other doctors also found he was not disabled. *Id.* at 1199-1200.

In *Burchett v. Unum Life Ins. Co. of America*, 2009 WL 256561 (E.D. Ky. Feb. 3, 2009), the court held that the administrator's denial of disability benefits to an emergency room physician was not an abuse of discretion. The physician's partners had voted him out of the partnership, and he was later diagnosed with depression. However, the evidence was that he had worked in the ER until he was terminated, that he had intended to continue to work until he learned of the termination, and that the evidence did not support a finding of a "complete inability to perform" the duties of an ER doctor. *Id.* at *3.

Unlike the facts in *Kunstenaar* and the other cited cases, in the present case substantial medical and non-medical evidence was presented that Mr. Bray was unable to perform his job duties satisfactorily because of the undetected tumor in his brain. The medical evidence was systematically ignored. The evidence of Mr. Bray's continued efforts to work after his employment by PCW was terminated was viewed myopically, without any apparent effort to see the whole picture or, particularly on the internal appeal, to adjust to a continuing stream of evidence that contradicted the position that Sun Life initially took and to which it doggedly continued to adhere.

This Court finds and concludes that the decision that Mr. Bray was able to perform all of the material and substantial duties of his occupation when he was terminated from PCW, and therefore Sun Life's denial of long term disability benefits, was not supported by substantial evidence. It was arbitrary, capricious and therefore, an abuse of discretion.

## B. **Life Insurance Claim.**

As indicated, the life insurance policy requires that Mr. Bray must have been totally disabled while he was still employed but, for this purpose, defines total disability to mean that an injury or sickness "prevents you from performing all of the main duties of any occupation that you are or become qualified for by education, training or experience." AR 5-6. Thus, whereas for purposes of long term disability benefits Mr. Bray had to show that he could not perform the material and substantial duties of his regular occupation, for survivor benefits Mrs. Bray must show that he could not perform the duties of "any occupation" for which he was or could become qualified.

At the outset it must be noted that the facts of the present case are significantly different from those in the cases cited by Sun Life. In those cases the employee qualified for an initial period of benefits by showing that he could not perform the material duties of his regular job. To continue to receive benefits after the initial period, the employee was required to show that he could not perform the duties of "any occupation." Typically, the issue turned on whether a disability that rendered the employee unable to perform a physically demanding job could, after appropriate training, perform a sedentary job. *See Brigham v. Sun Life of Canada,* 317 F.3d 73, 83-86 (1st Cir. 2003)(a paraplegic who became unable to travel because of the physical demands of repeatedly having to get himself and his wheelchair in and out of a vehicle and received disability payments for 60 months was not, according to the administrator's medical consultants and other medical evidence, restricted from sedentary work); *McKenzie v. General Tel. Co. of California,* 41 F.3d 1310, 1317-18 (9th Cir. 1994)(medical evidence showed that a service manager who received disability payments for 18 months due to back pain, but who was a highly educated 52-year old individual, could perform other occupations and perhaps even his old

occupation); *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1309 (5th Cir. 1984)(medical evidence supported the administrator's finding that a truck driver who received 24 months of disability payments due to a degenerative back condition could perform sedentary to light work).

In the present case Mr. Bray did not apply for disability payments until after the tumor was diagnosed and was believed, by his doctors, his wife and others, to be the cause of the significant problems he began to experience during the second year of his position with PCW. The impacts of the tumor increased as the tumor continued to grow. This continued after his employment ended. There was no issue of his being qualified or trainable to perform some other occupation, sedentary or otherwise. He was already well along the path that culminated in his death. For him, the distinction between being able satisfactorily to perform the duties of his "regular occupation" and to perform the duties of "any occupation" is a distinction without a difference.

Sun Life denied the claim and, despite the additional information then provided, denied the appeal. Once again it all but ignored the medical evidence. Ms. Leveille noted that Dr. Arenson had once indicated that Mr. Bray was obligated to cease work on May 21, 2007, disregarding all his later correspondence that explained that the disability caused by the tumor likely dated back as far as December 2005. She noted that Dr. Adolf had once listed December 1, 2006 as the disability date but ignored her later indications that the behaviors for which she was treating Mr. Bray in September and October 2006 were likely secondary to the tumor. In short, the information received from the doctors was selectively and, in context, inappropriately cited.

Ms. Goodwin at least acknowledged receiving letters and reports from Drs. Adolf, Arenson and Schneiders. However, she did not discuss their substance. Instead, she discounted

them because they were not treating Mr. Bray in October 2006.  That hardly justifies ignoring

opinions that necessarily were expressed as a matter of hindsight after the tumor was discovered.

*Cf. Woo v. Deluxe Corp.,* 144 F.3d 1157, 1162 (8th Cir. 1998)(discussed in more detail below).

Her comment is not even correct with respect to Dr. Adolf, who was treating Mr. Bray while he

was still employed, and who later expressed the opinion that the behaviors for which she was

treating him were secondary to the tumor of which she was unaware at the time.  Ms. Goodwin

suggests, without citing evidence, that the doctors were unaware of Mr. Bray's work after he was

terminated by PCW.  That is contrary to the facts that were in her file.  Dr. Arenson's letter of

April 7, 2009 expressly states that he had reviewed Mr. Briere's denial letter of March 13, 2008,

which had discussed Mr. Bray's post-termination activities.  Dr. Wortzel's report also indicated

that he had reviewed Sun Life's LTD denial.  AR 626; LTDAR 50-55.  However, Ms.

Goodwin's letter does not even mention Dr. Wortzel.  Consistent with its previous stance, Sun

Life did not, so far as the record discloses, attempt to obtain any medical information or opinions

of its own.

Instead, Ms. Goodwin denied the life insurance claim essentially on the same grounds

that had been given in support of the denial of the long term disability claim.  There is again no

indication that she made any effort to determine whether Mr. Bray's work, before or after he was

terminated by PCW, was competent or satisfactory.  Documents that had been submitted to her

showed several instances where it was not.  Ms. Goodwin mentioned that Mr. Bray had indicated

on an application for Social Security benefits that he became disabled on May 21, 2007.  I

wonder whether Ms. Goodwin considered the possibility that he (if indeed he actually filled out

the application himself) simply wrote down the date his tumor was detected or the likelihood that

his opinion was less informed than that of his doctors?

I can understand the discounting of Mrs. Bray's effort to clarify or disavow some of the comments she had made to Dr. Adolf in September 2006 about behaviors Mr. Bray had demonstrated in years past.  Mrs. Bray's comments can fairly be discounted as self-serving. Moreover, there surely is some truth in Mrs. Bray's original letter.  I do not doubt that she had observed behaviors by her husband in the past of which she was critical and that might have appeared to her to be similar to some of the behaviors that were troubling her in 2006.

However, the evidence from co-workers, colleagues, and friends was overwhelming that his behavior in 2006 was materially different and worse.  There was, of course, a medical explanation for that – he was suffering from the debilitating effects of a large malignant tumor in his brain.  However, from beginning to end, Sun Life refused to acknowledge that the tumor might have been the cause of the deterioration of his work, or that Mr. Bray might in any sense have been unable to carry on his occupation or any other occupation that could be seen as relevant to the situation.

A distinguishable but nevertheless instructive case is *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1161 (8th Cir. 1998).  During nearly 15 years of employment Woo secretly suffered from multiple sclerosis, but it was generally stable and did not significantly impact her work.  In 1993 she began to experience symptoms of severe fatigue, stiffness, pain and loss of concentration that affected her job performance to the point that a supervisor considered changing her job duties. She consulted doctors, but they did not diagnose what later turned out to be systemic scleroderma, a potentially debilitating and fatal disease.  In November 1993 Woo resigned, without disclosing her medical condition and indicating that she was leaving to pursue other opportunities (although she wrote on a questionnaire that she did not consider her resignation to be a "voluntary separation").

Three months later Woo was diagnosed as suffering from scleroderma. Her doctors determined that scleroderma symptoms had existed at least several months before she resigned. Woo then applied for long term disability benefits under her former employer's plan, which defined disability as being "prevented by accidental bodily injury or sickness from doing all the material and substantial duties of your own occupation." The court reversed the district court's grant of summary judgment upholding the administrator's denial of the claim. The court applied an abuse of discretion standard, albeit a somewhat less deferential one because the administrator, as in the present case, was in a conflict position. The administrator, who did consider Woo's medical evidence and an opinion from its own in-house medical consultant, relied heavily on Woo's failure to mention her condition as a reason for her resignation and the fact that her doctors had not determined that she was disabled before she resigned. The court of appeals noted that Woo historically had not disclosed her health problems and that she had not asked her doctors before she resigned whether she was disabled. The court continued, "[t]his evidence is further diluted by the retrospective disability determinations provided by [the doctors who subsequently diagnosed her disease]. Moreover, all of Woo's treating physicians connected the physical problems she experienced during the insured period to her eventual diagnosis." *Id*. at 1162 (citation omitted).

*Woo* was decided under a disability definition similar to the long term disability standard in the Sun Life policy. However, as indicated above, there is no practical difference in the present case between that standard and the "any occupation" standard that defines total disability for purposes of life benefits. I cite *Woo* because the court recognized, as Sun Life did not, that retrospective opinions of doctors who determine that an undiagnosed condition existed and impacted the employee's job performance before the employment must be seriously considered.

"Fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 809 (10th Cir. 2004).

In sum, the Court concludes that Sun Life's determination that Mr. Bray was not totally disabled within the meaning of the life insurance policy was not supported by substantial evidence; rather, it was arbitrary, capricious and an abuse of discretion.

## <u>ORDER</u>

1. Plaintiff's Motion for Summary Judgment [doc. #79] as to both the long term disability claim and the life insurance claim is GRANTED.

2. The parties' Joint Motion for Judgment on the Pleadings [#88] is GRANTED.

3. The Court orders that final judgment enter in favor of Cynthia Moltz Bray, individually and as the personal representative of the Estate of John Bray, and against Sun Life and Health Insurance Company, Inc., the judgment to include long term disability benefits following the termination of his employment by PCW on October 4, 2006 in the amount provided by the policy through the date of Mr. Bray's death; life insurance benefits in the amount provided by the policy; prejudgment and post-judgment interest as provided by law; and costs.

DATED this 27th day of February, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge